**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON**

**TERESA LYNN LICHLYTER,**

      **Plaintiff,**

**v.**                           **CASE NO. 6:11-cv-00597**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Teresa Lynn Lichlyter (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on December 4, 2007, alleging disability as of October 5, 2007, due to herniated back discs, depression, anxiety, hepatitis C, and pain in hands, neck, shoulders, low back, hips, knees, legs, and ankles.  (Tr. at 13, 128-33, 134-36, 140-46, 147-49, 175-83, 214-223, 239-44, 249-53.)   The claims were denied initially and upon reconsideration.  (Tr. at 13, 55-59, 60-64, 65-69, 70-74, 78-83.)  On October 31, 2008, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 84 .)

The hearing was held on December 18, 2009 before the Honorable William R. Paxton.  (Tr. at 24-48, 93, 100, 116.)  By decision dated January 11, 2010, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 13-23.)  The ALJ's decision became the final decision of the Commissioner on July 6, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-4.)  On September 2, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie

2

case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 15.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of degenerative disc disease of the lumbar spine, hepatitis C virus, chronic obstructive pulmonary disease, degenerative change at the distal interphalangeal joint of the little finger of the right hand, obesity, major depressive disorder, generalized anxiety disorder, personality disorder and attention deficit hyperactivity disorder.  (Tr. at 15–16.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 16-18.)  The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations.  (Tr. at 18-21.)  Claimant has no past relevant work.  (Tr. at 21.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as hand assembler, packer, and alarm monitor, which exist in significant numbers in the national economy.  (Tr. at 22.)  On this basis, benefits were denied.  (Tr. at 22-23.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.   <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 39 years old at the time of the administrative hearing.  (Tr. at 29.)  She has a GED and one semester of college.  (Tr. at 30.)  In the past, she worked as a restaurant employee, a home day-care provider, and a telemarketer.  (Tr. at 32, 39.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below:

Physical Evidence

Records indicate Claimant was treated at Family Health Care Center on twenty-eight occasions from January 27, 2003 to May 15, 2006 for a variety of illnesses including hepatitis, herpes simplex, bronchitis, depression, urinary incontinence, muscle spasms, neck and back pain.  (Tr. at 438-65.) The handwritten notes are largely illegible.

On January 5, 2004, Claimant had an x-ray of her right hand at Camden-Clark Memorial Hospital due to complaints of pain.  (Tr. at 428.)  Jeff Moncman, M.D., radiologist, reported: "The relationship of the carpal bones is normal...Some degenerative change is noted involving the DIP joint of the little finger."  Id.

On February 22, 2004, Claimant had an MRI of the lumbar spine and canal.  (Tr. at 422, 666.)  W. Michael Hensley, M.D., radiologist, Camden-Clark Memorial Hospital reported: "Posterior annular tear and moderate size midline subligamentous disc protrusion is seen at L5-S1 but no actual sac compression or direct contact with nerve root is seen."  Id.

Records indicate Claimant was treated at Johnson Chiropractic Clinic on twenty-six occasions from March 2, 2004 through December 30, 2004.  (Tr. at 281-307.)  Claimant's symptoms on the initial visit were described as: "Lower back pain...neck stiff...affecting sex life, also causing occasional inability to hold bladder."  (Tr. at 307.)

On April 6, 2004, Claimant had a total abdominal hysterectomy at Camden-Clark Memorial Hospital due to continuing complaints of abdominal pain.  (Tr. at 378-421.)  She was assessed as "doing well" and discharged on April 10, 2004.  (Tr. at 378.)

On June 12, 2004, Claimant presented to the Camden-Clark Memorial Hospital emergency department [ED] following an automobile accident in which she was an

unrestrained driver with a chief complaint of "pain and rigidity of the neck."  (Tr. at 366.)

Remigio O. Jacob, M.D. stated: "I ordered x-ray of the cervical spine and this showed no

fracture or subluxation.   Thoracic and lumbar spine showed no fracture and no

subluxation." (Tr. at 366-68.)

On July 19, 2004, Craig A. Chambers, D.O., radiologist, Camden-Clark Memorial

Hospital, reported than an MRI of Claimant's lumbar spine/cord showed: "Focal disc

protrusion at the L5-S1 level which creates mild impression upon the ventral thecal sac and

minimal impression upon the exiting right S1 nerve root."  (Tr. at 362.)

Records indicate Claimant began physical therapy at Mountain River Physical

Therapy on July 27, 2004 and ended it on September 20, 2004.  (Tr. at 272-80, 657-66.)

Claimant's chief complaint was stated as "[s]evere neck and back pain following MVA

[motor vehicle accident]." (Tr. at 273.)  During the course of therapy, she attended thirteen

sessions and cancelled or did not show for eight sessions.  Id.  Justin Eisenhofer, MPT,

noted on the final visit:  "Symptoms very up and down...Hold on further treatments...until

further medical information understood...other medical symptoms including incontinence

and patient apprehension as a result."  (Tr. at 277.)

On August 18, 2004, Bernard O. Garrett, D.O., radiologist, Camden-Clark Memorial

Hospital, reported that an MRI of Claimant's cervical spine and cord were normal with "no

abnormality detected."  (Tr. at 359.)

On October 26, 2004, Kenneth Miller, M.D., radiologist, Camden-Clark Memorial

Hospital, reported that an MRI of Claimant's brain was "negative...with no abnormality

seen."  (Tr. at 350.)

On November 20, 2004, Craig A. Chambers, D.O., radiologist, Camden-Clark

Memorial Hospital, reported that Claimant's MRI lumbar spine showed: "Small focal disc protrusion at the L5-S1 level which is stable.  This creates minimal impression upon the ventral thecal sac and some mild impression upon the exiting nerve roots.  No interval change is identified."  (Tr. at 344.)

Records indicate Claimant was a patient at Dawn Injury and Wellness Center on five occasions between October 26, 2005 and February 20, 2006.  (Tr. at 308-12.)  Although the handwritten notes are mostly illegible, notes indicate Claimant's chief complaint is "herniated L5, pain down butt cheeks and right knee."  (Tr. at 309.)

On April 29, 2006, Claimant presented to the Camden-Clark Memorial Hospital emergency department due to a large abscess on her right breast. (Tr. at 313-44.)  Khalil Murad, M.D., stated in the discharge summary of May 3, 2006:

> Teresa is a 35 year old white female with a history of IV drug abuse, who was seen in the ED for evaluation of redness and pain in her right breast.  Patient stated that she did inject drugs with Cocaine directly into her right breast.  Two days after the injection she [developed]...an abscess...A surgery consult was requested and then incision and drainage of the abscess was done...Patient requested an HIV and Hepatitis C test to be done.  Her Hepatitis C antibodies came back positive.  HIV test is pending at the time of this dictation.

> DISPOSITION: Patient will be discharged home today.  She was instructed to follow up with infectious disease for consideration of Interferon therapy for her Hepatitis.  She was also instructed to complete antibiotic course...

(Tr. at 316.)

On June 30, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment stating that Claimant's primary diagnosis is "chronic back pain syndrome" and her secondary diagnosis "Hepatitis C." (Tr. at 471-78.)  The evaluator, Cindy Osborne, D.O., found Claimant could occasionally lift and/or carry 50 pounds,

frequently lift and/or carry 25 pounds, stand and/or walk and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and was unlimited in the ability to push and/or pull. (Tr. at 472.) Dr. Osborne found Claimant had no postural, manipulative, visual, communication, or environmental limitations. (Tr. at 473-75.) Dr. Osborne concluded:

> Claimant with h/o [history of] Hep C from IV drug abuse. Recently treated for breast abscess and cellulitis due to injection of IV drugs into breast tissue. Was treated by wound care center. Also with c/o [complaints of] back followed by TP [sic, PT; physical therapy] and chiropractor. No evidence of radiculopathy but takes muscle relaxants and pain meds. ADL's are restricted but out of proportion to expected. Complaints are partially credible and support decrease in RFC to medium.

(Tr. at 476.)

On January 23, 2007, Robert Johnson, D.C., Johnson Chiropractic Center, indicated on a form that Claimant had "normal" gait and station, fine motor ability, gross motor ability, muscle bulk, motor strength, and coordination. (Tr. at 498-99.) He marked that Claimant had "abnormal" joints (swelling, effusion, tenderness) of the lumbar, reflexes, and sensory deficits. Id.

In a report dated April 30, 2007, Dr. Johnson stated:

> **HISTORY**: Chronic LBP [low back pain] for several years. Acute episode of severe LBP w/ pain radiating to L [left] leg. Pt [patient] was treated with CCM, EMS [electric muscle stimulation], heat, cold, V/S and home exercises. After 12 weeks pt. was pain free. She experienced an exacerbation at the 1st of October, tx [treatment] did not relieve pain. MRI was performed. Pt referred for pain shot and PT [physical therapy].

(Tr. at 497-501.)

Records indicate Claimant was treated by Brandon M. Wolfe, D.O., Riverview Primary Care, on eight occasions between November 6, 2007 and July 15, 2008 for a

depression, panic attacks, sore throat, cough, fever, back/hip pain, hepatitis C, acid reflux, and medication refills.  (Tr. at 546-83, 620-45.)   During this time period, there are numerous telephone messages wherein Claimant requests refills of her Roxicodone medication.  Id. Records indicate that Dr. Wolfe wrote prescriptions for Roxicodone 5 mg, #90 to Claimant on February 6, 2008, March 7, 2008, March 17, 2008, April 17, 2008, July 2, 2008, and August 5, 2008.  (Tr. at 551, 553, 556, 575, 576, 578, 640, 643.)

Records indicate Claimant was treated by Seyoum Bage, M.D. on four occasions between November 13, 2007 and January 22, 2008 for chronic hepatitis C.  (Tr. at 524-45.)

On December 6, 2007, Claimant presented to the Camden-Clark Memorial Hospital Emergency Department with complaints of low back pain.  (Tr. at 503.)  Andrew T. Hughes, D.O., stated: "She is in no acute distress.  MEDICAL EVALUATION: Lumbar spine x-rays were performed and interpreted by the radiologist as negative.  IMPRESSION: 1.  Low back pain/strain."  (Tr. at 503-04.)

On December 6, 2007, Kenneth Miller, Radiologist, Camden-Clark Memorial Hospital, reviewed x-rays of Claimant's lumbar spine and concluded: "There are mild degenerative changes of the lumbar spine.  There is mild disc space narrowing at L5-S1. The other disc spaces are fairly well-preserved.  There is mild anterior spurring at multiple levels...There are no compression abnormalities.  IMPRESSION: 1.  Mild degenerative changes of the lumbar spine."  (Tr. at 510.)

On December 7, 2007, Philip Strobl, M.D., radiologist, St. Joseph's Hospital, reviewed Claimant's thoracic spine x-rays and concluded: "There is very mild degenerative disc disease in the lower thoracic spine with minimal spurring anteriorly.  The vertebral bodies are normal in height and alignment.  No significant disc space narrowing is noted."

(Tr. at 514.)

On December 7, 2007, Dr. Strobl reviewed an MRI of Claimant's lumbar spine without contrast and concluded: "There is mild degenerative disc disease at L5-S1 where there is desiccation and narrowing with a central disc herniation. There is very mild caudal migration. However, there is no evidence of disc herniation, nerve root impingement, or significant central stenosis at any lumbar level." (Tr. at 515.)

On December 14, 2007, Claimant had a "[s]uccessful CT guided random liver biopsy" performed at St. Joseph's Hospital to monitor her chronic hepatitis C. (Tr. at 513.)

On March 14, 2008, Brandon M. Wolfe, D.O., Riverview Primary Care, indicated on a form that Claimant was right-hand dominant and had "normal" vision, hearing, speech, gait, fine motor ability, grip strength and range of motion in both hands, gross motor ability, muscle bulk, neurological reflexes, sensory deficits, motor strength, coordination, mental status, respiratory orthopnea, cyanosis, edema, carciovascular, and digestion and marked "abnormal" in regard to station, lumbar joints, respiratory, and dyspnea with exertion. (Tr. at 546-50.) He specifically noted no joint deformities in Claimant's hands and that she could make a fist, pick up coins, button clothing, and tie a shoestring. (Tr. at 547.)

On May 29, 2008, a State agency medical source provided a Physical Residual Functional Capacity (RFC) Assessment which stated that Claimant's primary diagnosis was "low back pain, djd [degenerative joint disease] L/S [lumbar] spine, hepatitis C." (Tr. at 584.) The evaluator, Atiya M. Lateef, M.D., opined that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk and sit (with normal breaks) about 6 hours in an 8-hour work day, and push and/or pull unlimited.

(Tr. at 585.)   Dr. Lateef opined that Claimant could frequently perform the postural activities of climbing ramp/stairs, stooping, kneeling, and crouching; occasionally balancing and crawling; and could never do climbing of ladder/rope/scaffolds.  (Tr. at 586.) Dr. Lateef found that Claimant had no manipulative, visual, communicative or environmental limitations, save to avoid concentrated exposure to temperatures, vibration, and fumes, and to avoid all exposure to hazards.  (Tr. at 587-88.)  Dr. Lateef concluded: "The claimant felt to be partially credible as the MER [medical evidence of record] supports the basis for a degree of pain and limitation, but fails to support the disabling degree alleged by the claimant...RFC reduced to medium with postural and environmental limitations as mentioned."  (Tr. at 589-91.)

On October 1, 2008, Rabah Boukhemis, M.D., Internal Medicine, completed a Case Analysis form wherein he stated: "LBP/DJD Spine/HpC.  Prior RFC done on 5/29/08 Medium.  Mild DDD of the spine without neuro involvement.  No evidence of cirrhosis of the liver.  The new evidence is not significant enough to change the prior RFC."  (Tr. at 648.)

On May 21, 2010, Robert Akers, D.C., stated in a letter:

> To Whom It May Concern:
> Ms. Teresa Lichlyter has been under my care for chronic low back pain and sciatica.  This is caused by a bulging disc in her lumbar spine and spinal arthritis.  This limits her ability to lift repetitively using the lumbar, and to stand or sit for prolonged time.  Henceforth, limited her ability to have gainful employment. Any further questions please feel free to contact my office.

(Tr. at 669.)

Psychological Evidence

On June 30, 2006, a State agency medical source completed a Psychiatric Review

11

Technique form.  (Tr. at 479-92.)  The evaluator, Karl G. Hursey, found Claimant's impairment was not severe regarding her affective, anxiety-related, and substance addiction disorders.  (Tr. at 479.)  He found Claimant had no limitations regarding activities of daily living and in maintaining social functioning, mild limitation in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. at 489.)  He stated that the evidence does not establish the presence of "C" criteria.  (Tr. at 490.)  Dr. Hursey concluded:

> Based on the MER the Clmt's [Claimant's] statements are partially credible.
>
> Family Health Care Center notes from May 2006 refer to Clmt requesting physician slip excusing her from work.  But on 4/21/06 they tried to call her at work and were told she didn't work there.  Frequent requests to increase dose/frequency of benzos & opioids.
>
> Clmt w/ [with] objectively confirmed recent poly-drug abuse (marijuana and injected cocaine for sure), no tx [treatment] for it.
>
> Limitations appear attributed by Clmt to physical sxs [symptoms] (MVA [motor vehicle accident], abscess in breast d/t [due to] injecting cocaine, etc.).

(Tr. at 491.)

On June 23, 2008, a State agency source provided a Client Interview [CI] and Mental Status Examination [MSE] of Claimant.  (Tr. at 592-95.)  The examiner Brenda Tebay, M.A., licensed psychologist, stated in regard to Claimant's substance abuse history: "Ms. Lichlyter states that she smokes a half a pack to a pack a day depending on her stress.  She stated three years ago she tried cocaine, but has not had anything for over three years.  She denies that she consumes any alcohol products."  (Tr. at 593.)  She stated that Claimant described her daily activities as "she stays at home and does not come out unless she absolutely has to."  (Tr. at 594.)  Ms. Tebay concluded:

MENTAL STATUS EXAMINATION: Appearance: Ms. Lichlyter drove herself to the evaluation site. She was dressed in weather appropriate clothing. Her psychomotor behavior was fidgety. Attitude/Behavior: Ms. Lichlyter was very talkative. Interpersonally, she was cooperative. As she stated, "I want to pour out my heart." Speech: Speech was clear, coherent, in a rapid and elevated tone. Orientation:: x4. Mood: Her mood was nervous and depressed. Affect: Her affect was anxious and sad at times. Suicidal/Homicidal Ideation: There is a history of suicidal/homicidal thoughts, and a safety plan was reviewed. Thought Process: Thought processes were without impairment. Thought Content: There was no indication of delusions, obsessions, or compulsions; however, Ms. Lichlyter has been examining and checking doors and windows since her apartment was broken into in March of 2008. Perceptual: There is no indication of hallucinations or illusions. Insight: Ms. Lichlyter has some insight into her current disability, but is not able to perceive a satisfactory solution at this time. Judgment: Within normal limits, based on answers to hypothetical questions. Concentration: Concentration was within normal limits, as Ms. Lichlyter was able to complete serial threes without any disturbance in concentration. Immediate Memory: Within normal limits...able to immediately recall four words. Recent Memory: Moderately deficient...only able to recall two of the four words given after a 30-minute delay. Remote Memory: Within normal limits...no difficulties recalling personal historical data. Social Functioning: Mildly deficient...very talkative and wanted to pour out her heart. A recommendation to a local therapist was made.

DIAGNOSTIC IMPRESSIONS:

| Axis I | 296.32 | Major depressive disorder, recurrent, moderate. |
| | 300.02 | Generalized anxiety disorder |
| Axis II | 301.02 | Personality disorder, not otherwise specified, with borderline traits... |

DIAGNOSTIC RATIONALE: The Axis I diagnosis was given based on these presenting mental health symptoms. Ms. Lichlyter reported that she has cried for the last 24 days. She also presents with sadness, hopelessness, guilt, embarrassment. She does not sleep. She is easily frustrated and angry. She is anxious and nervous. Her mind races. She is forgetful. She stays in, does not associate with others because she feels she cannot deal with people. She has family issues and financial problems. She does have a history of self-mutilation.

PROGNOSIS: Guarded.

CAPABILITY TO MANAGE FINANCES: If awarded finances, Ms. Lichlyter

13

would be able to care for those finances independently.

(Tr. at 594-95.)

On June 27, 2008, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 596-609.)  The evaluator, Frank Roman, Ed.D., concluded that an Mental Residual Functional Capacity [MRFC] Assessment was necessary in order to evaluate Claimant's affective, anxiety-related and personality disorders.  (Tr. at 596.)  Dr. Roman found that Claimant had a mild degree of limitation regarding activities of daily living and a moderate degree of limitation relating to maintaining social functioning, concentration, persistence or pace, and no episodes of decompensation.  (Tr. at 606.)  He concluded that the evidence did not establish the presence of the "C" criteria.  (Tr. at 607.)  He noted: "Based on MER claimant is credible as symptoms and hx [history] are consistent. See MRFC."  (Tr. at 608.)

On June 27, 2008, Dr. Roman completed a MRFC Assessment form.  (Tr. at 610-13.)  He concluded that Claimant was not significantly  in understanding and memory, other than being moderately limited in the ability to understand and remember detailed instructions.  (Tr. at 610.)  He found she was not significantly limited in sustaining concentration and persistence, other than being moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, and to work a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. at 610-11.)  Regarding social interaction, Dr. Roman found Claimant was not significantly limited in any area other than being moderately limited in the ability

14

to get along with coworkers without distracting them or exhibiting behavioral extremes.

(Tr. at 611.)  He found Claimant was not significantly limited in any adaptation abilities.

Id.  Dr. Roman concluded:

> Limitations are noted in Part 1 of the MRFC revealing moderate deficits in
> the Social and CPP [concentration, persistence, pace] domains.
>
> These deficits do not meet or equal a listing...
>
> She is worried about finances and very upset that one son is in jail.  She feels
> people are looking at and blaming her.  Her apartment was broken into and
> she worries about a reoccurrence.
>
> She is independent in her ADLs and the care of her son.  She avoids being in
> public except when necessary.
>
> Based on MER, from a psych viewpoint, she appears to retain the capacity to
> follow routine 1 and 2 step work duties in a low stress setting.

(Tr. at 612.)

On September 18, 2008, Joseph Kuzniar, Ed.D., Psychologist, completed a Case

Analysis form which stated: "I have reviewed the evidence in file and the decision of 6-27-

08 is affirmed as written."  (Tr. at 646-47.)

On October 1, 2009, a form titled "Tracking for Comp Psych's Physician's Progress

Note" with an illegible signature states: "Chief Complaint: feeling sick, meds are all good.

Klonopin is great...Hx [history] drug abuse...Hx of abusive ex...Patient is:...Stable."  (Tr. at

668.)

On November 21, 2009, John Atkinson, Jr., M.A., Licensed Clinical Psychologist,

conducted a clinical interview and mental status examination of Claimant at the request of

her representative.  (Tr. at 670-81.)  Mr. Atkinson stated:

SOCIETAL ADJUSTMENT:
The patient was arrested for passing bad checks, for battery, DUI, PI, and "I

15

don't know," but has nothing pending now.  She has been the recipient of a lawsuit for medical bills and filed bankruptcy instead of paying them...

MENTAL STATUS EXAMINATION:
APPEARANCE: In appearance, the patient was noted to be an average size, obese, right-handed female of 39 years with short, blonde-streaked hair and green eyes.
ATTITUDE/BEHAVIOR: The patient's attitude was histrionic, dramatic, vague and digressive.
SOCIAL: Social rapport was tentative.
SPEECH: Speech patterns tended to be coherent but tangential, circumstantial and rambling.
ORIENTATION: Today the patient was well oriented as to time, place and person.
MOOD: Observed mood was agitated and depressed.
AFFECT: Labile with crying.
THOUGHT PROCESS: Associations are relevant and the stream of thought is normal.
THOUGHT CONTENT: The patient has adopted paranoid attitudes of distrust toward her mother, her family and, "they discuss my life without me around."
PERCEPTUAL: The patient denies any usual [sic; unusual] perceptual activity except that related to drugs.
INSIGHT: Fair.
JUDGMENT: Within normal limits, the patient stating that if she found a letter on the street, she would put it in the post office.
IMMEDIATE MEMORY:  Within normal limits, the patient immediately recalled four of four words.
DELAYED MEMORY: Moderately impaired, the patient recalled two of four words.
REMOTE MEMORY: Broadly intact as assessed by history recall.
CONCENTRATION: Moderately impaired based upon an Arithmetic Raw Score of 9, Scale Score of 6 and Standard Score of 76.
ATTENTION: Mildly deficient based upon a DIGIT Span Raw Score of 12, Scale Score of 7 and Standard Score of 82.
ABSTRACT REASONING: Within normal limits based upon a Similarities Subtest Raw Score of 20, Scale Score of 8 and Standard Score of 88.
PSYCHOMOTOR BEHAVIOR: Increased based on clinical observation.
PERSISTENCE: Fair as demonstrated by examination behavior.
PACE: Accelerated as observed during the examination.
SOCIAL FUNCTIONING: Variable during the examination.

SOCIAL FUNCTIONING (SELF-REPORTED):
The patient goes to church every Sunday, has no friends that she would have any contacts with, sees her husband about once a week and goes to visit other

family about once a month. She states her sister comes to see her on an unpredictable schedule and she rarely sees her son. Interpersonal relationships are characterized by histrionic, crisis-oriented and stormy posture. In her approach to inquiry, the patient had some problems expressing herself, seemed alexithymic at times but attempted to be honest.

SUMMARY AND CONCLUSION:
In summary, we see here a 39-year-old female who presents as dramatic, histrionic, crisis-oriented and focusing on physical complaints. She carries a constant, high emotional charge which began in childhood with overstimulation in a number of ways, having been beaten, abandoned, sexually molested, etc., and she developed a chronic anger state disorder even then, attempting to kill her 18-month-old brother by putting him out on a roof by himself and bloodying his mouth. She also bullied her sister and pinched her and the patient has carried this chronic anger into adulthood. She shows a combination of histrionic predisposition and borderline personality with prominent substance abuse but states, "the drugs are over."

The patient continues to show emotional lability, is restless, careless, has never worked at any job more than a month or two, is easily bored and craves excitement. It is felt that her stress reaction as a child just never really went away and now she requires drama.

As can be easily seen, the patient, in any work or work-like situation would be undependable, unable to sustain effort, easily overwhelmed by various stimuli of the workplace, get along with others poorly because of her temper and under stress, may relapse back into drug and alcohol abuse.

DIAGNOSIS:
| Axis I | 296.90 | Mood Disorder - NOS (Major Depression, Anxiety, Chronic Anger State Disorder |
| | 304.80 | Polysubstance Dependent - By History, Early Remission |
| Axis II | 301.83 | Borderline Personality Disorder - Histrionic Type |
| Axis III | | See Medical Reports |
| Axis IV | | Relational Problems, Health Problems, Financial Problems |
| Axis V | | GAF=48, Serious to Major Impairment, Current and Past Year |

RATIONALE:
296.90        Manifested by mood instability associated with borderline personality including episodes of intense depression with suicide attempt, frequent episodes of anxiety and a chronic anger states disorder where she is ready to lash out at anybody, at anytime

17

304.80      Manifested by a long history of alcohol abuse, arrested for
            drinking, multiple drug use including IV drugs where she
            contracted Hepatitis-C. She states, "the drugs and alcohol are
            over," but it is unclear how long this will last.

301.83      Manifested by the usual disturbed childhood with beatings,
            abandonment, sexual abuse, etc., and the usual mood disorder
            with chronic anger, frequent displays of temper, assaults on
            others, unstable, intense relationships, substance abuse and a
            histrionic predisposition in which the patient constantly carries
            a high emotional charge, is crisis-oriented and requires drama
            at all times. She has never worked more than a month or two
            at any job and is chronically bored, irritable, and hard to get
            along with.

PROGNOSIS: Guarded.
CAPABILITY: If any benefits are granted, the patient would be able to
manage her own financial affairs including money payments as long as she
abstains from drugs and alcohol.

(Tr. at 678-81.)

On November 21, 2009, Mr. Atkinson also completed a Mental Assessment of Ability
to Do Work-Related Activities form. (Tr. at 670-72.) Mr. Atkinson opined that Claimant
would not be limited in her ability to understand, remember and carry out simple job
instructions and in her ability to maintain personal appearance. (Tr. at 671-72.) He stated
she was slightly limited in her ability to function independently. (Tr. at 671.) Mr. Atkinson
determined that Claimant was moderately limited in her ability to follow work rules, deal
with work stresses, maintain attention/concentration, to understand, remember and carry
out detailed, but not complex job instructions. Id. He stated that she was markedly limited
in her ability to relate to co-workers, deal with the public, use judgment, understand,
remember and carry out complex job instructions, relate predictably in social situations,
and complete a normal work day and work week without interruptions from psychologically
based symptoms and to perform at a consistent pace without an unreasonable number and

length of rest periods.  (Tr. at 671-72.)   He found she would be extremely limited in her ability to interact with supervisors and to behave in an emotionally stable manner.  Id.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assessing Claimant's residual functional capacity [RFC] because he did not take into consideration all of Claimant's severe physical and psychological impairments. (Pl.'s Br. at 2-5.)  Specifically, Claimant argues:

> While the ALJ took into consideration the claimant's degenerative disc disease with resulting low back pain and chronic obstructive pulmonary disease in assessing the RFC, he failed to include the diagnoses and resulting limitations of hepatitis C, right hand degenerative changes, and psychological factors...

> The record is replete with complaints of right hand pain and decreased strength, as well as general fatigue and nausea as a result of the claimant's hepatitis C.  The ALJ does not incorporate those limitations in his RFC, even after finding both to be severe impairments.

> Without including the appropriate limitations in the RFC, the ALJ erred in making his final determination that the claimant is not disabled.   The appropriate limitations in the RFC affect the answers given by the vocational expert, thus changing the entire outcome of the individual's claim for benefits.

> Additionally, the ALJ failed in his duty to develop the record by not ordering a physical consultative examination. The file lacked any physical consultative examinations and due to the variety and severity of the claimant's physical impairments, a CE was necessary to fully develop the record.  The claimant's representative did ask the ALJ consider sending the claimant for a comprehensive physical CE, however the ALJ failed to discuss or provide a rationale for denying this request.  This decision was made in error as it is in direct contrast to 20 C.F.R. §§ 404.1512 which suggests that a consultative examination is necessary when the evidence is consistent but insufficient to decide disability.

(Pl.'s Br. at 3-4.)

### The Commissioner's Response

The Commissioner asserts that the ALJ's findings that Claimant could perform sedentary work identified by the vocational expert are supported by substantial evidence. (Def.'s Br. at 10-17.) Specifically, the Commissioner argues:

> There is no support for Plaintiff's allegation that the ALJ's assessment of her residual functional capacity is deficient with respect to her hand (Pl.'s Br. at 4). Although there is evidence of a bony spur on her little finger on an x-ray taken in 2004, after she was involved in an automobile accident, the medical source statement of Dr. Wolfe in March 2008, indicated no limitations on Plaintiff's use of her right hand (Tr. 428, 547). The opinion of a treating physician may be given deference when it is supported by the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Here, Dr. Wolfe indicated that Plaintiff had normal grip strength, normal range of motion of the fingers and wrist, and no joint deformities (Tr. 547). Plaintiff could make a fist, pick up coins, button clothing, and tie a shoestring (Tr. 547). Therefore, absent any evidence of limitations on Plaintiff's use of her right hand, the ALJ was not obligated to include any limitations as he described Plaintiff's residual functional capacity to the vocational expert.

> Similarly, Plaintiff's allegations that the ALJ erred in not including limitations from her Hepatitis C virus is also without merit (Pl.'s Br. at 4). The ALJ considered Plaintiff's allegations of fatigue to the extent that he limited her to sedentary work, the least demanding exertional level of work. The ALJ considered that Plaintiff's level of daily activities was compatible with the performance of sedentary work. The ALJ noted that Plaintiff reported that she cared for her baby granddaughter for 30 hours a week, prepared meals for her son, drove a car, shopped for groceries and personal needs, visited her mother, did laundry, went to church twice a week, and kept house (Tr. 20, 30, 36, 38, 201-03, 224-30). This level of activity supports the ALJ's finding that Plaintiff's virus was not accompanied by disabling fatigue or any other allegedly disabling symptom.

> Furthermore, the Mayo Clinic literature explains that a diagnosis of hepatitis C does not necessarily require treatment when only slight liver abnormalities are detected...Plaintiff's guided liver biopsy report indicated benign tissue and mild inflammation (Tr. 513). Plaintiff submitted no evidence of treatment for hepatitis C. Arguably, the biopsy report, lack of treatment, and Plaintiff's activity level did not require the ALJ to include any specific limitations from hepatitis C in his assessment of Plaintiff's residual functional capacity.

There is also no merit to Plaintiff's argument that the ALJ was required to obtain a consultative physical examination in this case (Pl.'s Br. at 4-5). The regulations that Plaintiff cited provide that an ALJ may obtain a consultative examination when there is no medical source statement from a treating physician within 12 months prior to the date of application, and the evidence of record is insufficient for a determination of disability. <u>See</u> 20 C.F.R. §§ 404.1512, 416.912. However, in the present case, there was a medical source statement from Dr. Wolfe, Plaintiff's treating physician, in March 2008, a year after Plaintiff filed her applications, and one year prior to her hearing, that is consistent with the ALJ's formulation of Plaintiff's physical residual functional capacity (Tr. 457). As noted above, Dr. Wolfe indicated that Plaintiff had normal reflexes in her upper and lower extremities, normal motor strength, a normal gait, normal grip strength, normal range of motion of the fingers and wrist, and no joint deformities (Tr. 547-48). Dr. Wolfe's statement is more than adequate evidence in support of the ALJ's assessment of Plaintiff's residual functional capacity...

The hypothetical question that the ALJ posed to the vocational expert included the physical and psychological limitations that were supported by the record...

The vocational expert identified jobs that accommodated Plaintiff's limitations and that exist in significant numbers in the national economy. Therefore, the Commissioner has met his burden of proof at the fifth step of the sequential evaluation process by producing evidence of other work in the economy that Plaintiff could perform.

(Def.'s Br. at 13-17.)

<u>Analysis</u>

In his eleven-page decision, the ALJ considered the entire record and made these findings regarding Claimant's severe impairments, residual functional capacity, and credibility:

In this case, the medical evidence shows the claimant has the impairments consisting of degenerative disc disease of the lumbar spine, hepatitis C virus, chronic obstructive pulmonary disease, degenerative change at the distal interphalangeal joint of the little finger of the right hand, obesity, major depressive disorder, generalized anxiety disorder, personality disorder and attention deficit hyperactivity disorder. These impairments are not slight and have more than a *de minimus* effect on the claimant's ability to perform basic work activities. Accordingly, these impairments are "severe" as defined in 20

21

C.F.R. §§ 404.1520(c) and 416.920(c) and SSRs 85-28 and 96-3p...

The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)...In reaching this conclusion, the Administrative Law Judge has considered the opinions from the state agency medical consultants who evaluated the issue at the administrative review process and reached the same conclusions (20 C.F.R. 404.1527(f) and 416.927(f); SSR 96-6p). The Administrative Law Judge also notes no treating or examining medical source has stated the claimant has an impairment or combination of impairments that meets or equals the criteria of any listed impairment. Finally, neither the claimant nor her representative argued the claimant has an impairment of combination of impairments that meets or equals the criteria of any listed impairment...

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except she can never perform climbing of ladders, ropes, or scaffolds, can only occasionally perform climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, must avoid all exposures to hazards such as heights and machinery, must avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, and poor ventilation, is limited to understanding, remembering, and carrying out simple instructions and to only occasional interaction with the general public, would require a sit/stand option, and could not sit more than 30 minutes at a time or stand more than 15 minutes at a time.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p...

The claimant reported on her disability report when she filed her application for disability insurance benefits and supplemental security income that she was disabled because of hepatitis C virus and herniated discs and was limited in her ability to work because her back would not allow her to stand or sit for more than 10 minutes at a time, the hepatitis C virus caused her to feel very sick to her stomach, and the medication she took for nausea made her drowsy (Exhibit 8E)...

In addition, the claimant reported she did not finish what she started, she had unusual fears and behaviors, and she did not handle stress well (Exhibit 9E). The claimant reported on her pain questionnaire she had pain in her hands, neck, shoulders, low back, hips, knees, legs, and ankles (Exhibit 10E)...her hepatitis C virus causes her to get flustered, and she has depression...

The evidence also shows the claimant experiences mental health symptoms and Dr. Tebay, a consultative examining psychologist, diagnosed the claimant in June 2008 with major depressive disorder, generalized anxiety disorder, and personality disorder (Exhibit 17F). Furthermore, as discussed above in the "B" criteria, the claimant has not been experiencing any significant limitations in her ability to perform activities of daily living, function in a social setting, or to concentrate, persist and maintain pace and she has not experienced any episodes of decompensation of an extended duration. In summary, the clinical and objective findings do not indicate the claimant has been experiencing any debilitating physical or mental problems since she allegedly became disabled...

In terms of treatment, the claimant reported she takes the medication as set forth in Exhibits 8E, 13E, and 18E in the dosages indicated. However, there is no evidence that the claimant experiences significant side effects from her medications or that her medications have been frequently changed or the dosages altered due to side effects and/or ineffectiveness. Likewise, there is no evidence the claimant has been prescribed other pain/treatment modalities such as a TENS unit, back brace, wrist splints or an assistive device for ambulation; and no medical source of record has referred the claimant to a pain management clinic notwithstanding her allegations of chronic pain. Finally, it is noted that the claimant has not required aggressive medical treatment, frequent hospital confinement/emergency room care or surgical intervention for her condition notwithstanding her allegations of totally debilitating symptomatology.

As to the claimant's mental health impairments, the evidence reveals the claimant has never been psychiatrically hospitalized, never attended or been referred to a partial hospitalization program, and has never resided in a halfway house or in another highly supportive living arrangement (Exhibits 8E, 13E, 16E and 17E). Also, the progress notes contain one treatment note for a medicine check from October 2009 but there is no further documentary medical evidence that the claimant receives frequent mental health treatment (Exhibit 32F). Accordingly, the claimant has not received frequent outpatient mental health treatment since allegedly becoming disabled. Therefore, the claimant's history of treatment for her mental health impairments is entirely inconsistent with an individual who experiences debilitating symptoms.

As for the opinion evidence, the Administrative Law Judge recognizes that the state agency medical consultants who evaluated the evidence of record concluded the claimant is capable of performing work at the medium exertional level and does not have any more than "moderate" work-related limitations from her mental health impairments (Exhibits 16F, 18F and 19F). Although these opinions are entitled to less weight as they were provided by non-examining medial sources, they are considered expert medical opinions and are entitled to some weight considering they are consistent with the evidence in the record. The Administrative Law Judge also notes no treating or examining medical source has reported the claimant is disabled or provided a medical source statement inconsistent with the above-stated residual functional capacity.

In summary, after reviewing the clinical and objective findings in addition to the factors contained in SSR 96-7p, the Administrative Law Judge finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms but the statements concerning the intensity, duration, and limiting effects of the claimant's symptoms are not entirely credible and are inconsistent with the totality of the evidence.

(Tr. at 16-21.)

Residual Functional Capacity

Claimant first argues that the ALJ did not consider Claimant's severe impairments of hepatitis C, right hand degenerative changes, and psychological factors in making his residual functional capacity determination. (Pl.'s Br. at 2-4.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a) and 416.945(a) (2010). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be

able to do despite your impairment(s)."  Id.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments."  Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In the subject claim, contrary to Claimant's assertion that the ALJ did not consider Claimant's severe impairments of hepatitis C, right hand degenerative changes, and psychological factors in making his residual functional capacity determination, the ALJ clearly considered these impairments and did impose work-related limitations.  (Tr. at 18-21.)  Although the medical experts determined that Claimant could perform medium duty work, the ALJ generously reduced these recommendations to sedentary work with additional limitations which included:  Never "climbing ladders, ropes or scaffolds" which takes into consideration her right hand degenerative changes; "limited to understanding, remembering, and carrying out simple instructions and to only occasional interaction with the general public" which takes into consideration her psychological factors; and "would require a sit/stand option, and could not...stand more than 15 minutes at a time" which

takes into consideration Claimant fatigue related to her hepatitis C virus.  (Tr. at 18.)  It is noted that Claimant's treating physician, Dr. Wolfe in March 2008, indicated no limitations on Plaintiff's use of her right hand (Tr. 428, 547).  Also, on October 1, 2008, Dr. Boukhemis completed a Case Analysis form wherein he considered Claimant's Hepatis C diagnosis and noted: "No evidence of cirrhosis of the liver."  (Tr. at 648.)  Further, the ALJ's description of Claimant's mental residual functional capacity is supported by the assessment of Dr. Roman, who reviewed the report of Ms. Tebay.  (Tr. at 610-12.)

Vocational Expert

Claimant next asserts that the because the ALJ did not include "the appropriate limitations in the RFC...[this] affect[ed] the answers given by the vocational expert, thus changing the entire outcome of the individual's claim for benefits."  (Pl.'s Br. at 4.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989).  "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study the evidence of record to reach the necessary level of familiarity."  Id. at 51.  Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe.  Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

26

In the subject claim, contrary to Claimant's argument, the ALJ posed two hypothetical questions to the vocational expert [VE] that included the physical and psychological limitations that were supported by the record. (Tr. at 43-47.) The vocational expert testified that there are jobs that exist in significant numbers in the national economy that accommodate Claimant's limitations. (Tr. at 45-46.) In his second hypothetical to the VE, the ALJ specified a "low stress setting" to further accommodate Claimant's psychological factors and the VE again identified jobs that Claimant could perform that exist in significant numbers in the national economy. (Tr. at 46.)

Consultative Examination

Claimant next argues that the ALJ failed in his duty to develop the record by not ordering a physical consultative examination. (Pl.'s Br. at 4.)

Regarding the ALJ's duty to refer a claimant for a consultative examination, 20 C.F.R. §§ 404.1517 and 416.917 (2010) provide that

> [i]f your medical sources cannot or will not give us sufficient
> medical evidence about your impairment for us to determine
> whether you are disabled or blind, we may ask you to have one
> or more physical or mental examinations or tests.

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The court explained that the ALJ's failure to ask further questions and to demand the production of

further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence.  Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he or she is disabled.  20 C.F.R. §§ 404.1512(a) and 416.912(a) (2010).  Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment. Id. §§ 404.1512(c) and 416.912(c).  In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings.  It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.  The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . .  If the process ends at step two, the burden of proof never shifts to the Secretary.  . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel.  Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994).  Claimant bears the burden of establishing a prima facie entitlement to benefits.  See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  Similarly, he or she "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

Contrary to Claimant's argument, the ALJ did not fail in his duty to develop the record by not ordering a physical consultative examination requested by Claimant's representative at the hearing. (Tr. at 47.) At the hearing, the ALJ stated after the request: "I'll take a closer look at the file, and at the additional evidence that you're going to send in when the empirical material is sent to me and, I'll see if I would conclude that additional evidence is needed." (Tr. at 47-48.) The regulations state that an ALJ "may" obtain a consultative examination when there is no medical source statement from a treating physician within twelve months prior to the date of application and the evidence of record is insufficient for a determination of disability. See 20 C.F.R. §§ 404.1512, 416.912. In this claim, there was a medical source statement from Claimant's treating physician, Dr. Wolfe, dated March 14, 2008, showing essential normal findings. (Tr. at 547-49.) Dr. Wolfe's evaluation was done approximately four months after her applications for benefits had been filed. Although the evaluation was approximately one year and nine months prior to the hearing, Dr. Wolfe's statement, along with the other medical evidence of record, is sufficient to support the ALJ's assessment of Claimant's residual functional capacity. Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel and the regulations clearly state that obtaining a consultative examination is at the discretion of the ALJ. 20 C.F.R. §§ 404.1512, 416.912.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston. Pursuant to

the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.


  May 22, 2012
      Date

                                     Mary E. Stanley
                                     United States Magistrate Judge